UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES PHILLIPS,
DANIEL CARIONE,                              )
                        Plaintiffs,          )
v.                                           )       Civil Action No.        JUDGE OETKEN
                                             )
CITY OF NEW YORK, NEW YORK CITY              )       11 CIV 6685
POLICE DEPARTMENT, NEW YORK                  )
CITY POLICE DEPARTMENT ARTICLE               )
II MEDICAL BOARD,                            )
RAYMOND KELLY,                               )
Officially as the Police                     )
Commissioner, JOSEPH BOTTNER, M.D.,          )
Individually and officially,                 )
                        Defendants.          )

RECEIVED
SEP 23 2011
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

### I. NATURE OF THE CLAIM

1.  This is an employment related civil rights action brought by former Sergeant James Phillips and former Deputy Inspector Daniel Carione to challenge their involuntary retirement from police service by the City of New York after each one was medically approved for the use of hearing aids.

2.  Phillips and Carione seek declaratory judgment and an injunction to restrain the defendant employers from maintaining standards and guidelines for hearing which is a policy, custom, and practice which treats disabled and qualified police officers who wear hearing aids disparately, unfairly and unequally in the terms and conditions of employment.

3.  Also, Phillips and Carione seek compensatory and equitable damages for the treatment and conduct complained of in this action which has resulted in the loss of employment; loss of career advancement opportunities; loss of salary; reduction in pension benefits; extreme stress; humiliation; embarrassment; mental anguish; and damage to their reputation.

## II. JURISDICTION and VENUE

4.   Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. Sections 1331 and 1343 (a) (3) and (4), 28 U.S.C. Sections 2201 and 2202 of the Declaratory Judgment Act, Title I of the Americans with Disabilities Act of 1990 (as amended by the ADA Amendments Act of 2008), 42 U.S.C. §12101, *et seq.*, 42 U.S.C. Section 1983, and the Fourteenth Amendment to the United States Constitution.

5.   Plaintiffs also seek the pendent/supplemental jurisdiction of this Court, pursuant to 28 U.S.C. §1367 in conjunction with claims alleging violations of the New York City Human Rights Law, N.Y.C. Admin. Code §8-101, *et seq.*

6.   The claims for violations of the New York City Human Rights Law are based upon the same operative facts supporting the federal claims.

7.   The value of the rights in question is in excess of $100,000.00, exclusive of interest and costs.

## III. CONDITION PRECEDENT

8.   Prior to bringing this action, each plaintiff filed an administrative charge of discrimination with the New York office of the United States Equal Employment Opportunity Commission  naming the City of New York and the New York City Police Department as respondents in compliance with the Americans with Disabilities Amendments Act, 42 U.S.C. §12101 *et seq.*

9.   In or about October of 2010 Plaintiff Carione filed a charge of employment discrimination with the New York office of the Equal Employment Opportunity Commission ("EEOC").

10. Carione subsequently amended this charge in November of 2010.

11. In or about November 8, 2010, Plaintiff Phillips filed a charge of employment discrimination with the New York office of the EEOC.

12. Over 180 days have elapsed since the filing and service of each plaintiff's charge of discrimination, which has not been resolved.

13. In addition, each plaintiff has obtained a right to sue letter permitting each plaintiff to file the instant action in federal court. Plaintiffs bring the instant action within 90 days of the receipt of their respective right to sue letters.

14. The right to sue letter for each plaintiff are attached.

### IV. JURY TRIAL DEMANDED

15. Each plaintiff demands a trial by jury on each and every one of his claims as set forth below.

### V. PARTIES

**Plaintiff James Phillips**

16. James Phillips ("Phillips") is a citizen of the United States and a resident of the State of New York, County of Westchester.

17. At all times relevant to this complaint, Phillips was employed by the New York City Police Department ("NYPD") as a Sergeant assigned to the Bronx Task Force supervising patrol operations and functions.

18. Phillips was fully qualified to perform the essential functions of this position.

**Plaintiff Daniel Carione**

19. Plaintiff Daniel Carione ("Carione") is a citizen of the United States and a resident of the State of New York, City of New York, Kings County.

20. At all times relevant to this complaint, Carione was employed by the New York City Police Department ("NYPD") as a Deputy Inspector assigned to the Internal Affairs Division, supervising confidential and highly sensitive police misconduct investigations for his employer.

21. Carione was fully qualified to perform the essential functions of this position.

**Defendant parties**

22. Defendant City of New York ("the City") is a municipal entity existing under the laws and Constitution of the State of New York.

23. Defendant New York City Police Department ("NYPD") is an agency of the City of New York that is charged with providing law enforcement services to the residents of the City.

24. Defendant NYPD Article II Medical Board ("Medical Board") is a state actor and public municipal entity constituted by law and comprised of physicians and alternates as otherwise required by statute. N.Y.C. Admin. Code Section 13-123 a(1).

25. The Medical Board is required by statute to arrange for, and pass upon, all medical examinations, investigate all essential statements and certifications by or on behalf of a member of the police department in connection with an application for disability retirement. N.Y.C. Admin. Code Section 13-123 b.

26. The Medical Board is an agent of the NYPD Medical division and acts at the bequest of the NYPD medical division.

27. Defendant Raymond Kelly is the Police Commissioner of the New York City Police Department and the final policy maker who ultimately ratified and sanctioned the New York City Police Department standards and guidelines for hearing which are at issue in this complaint.

28. Defendant Raymond Kelly is a state actor and he is a defendant in his official capacity.

29. Defendant Joseph Bottner, M.D., is the Chief Medical Director for the New York City Employee Retirement System ("NYCERS") and a member of the Medical Board appointed as required by statute to represent the New York City Department of Health.

30. Joseph Bottner is a state actor in his capacity as a member of the Medical Board and he is a defendant in his individual and official capacity.

31. The reference to "all defendants" in this complaint means the City of New York, the NYPD and its various divisions, the Medical Board, and all individually named defendants unless otherwise stated.

## VI. RELEVANT FACTS

**Facts Relevant to Phillips**

32. Phillips began his police service in 1991.

33. At all times during his employment, Phillips performed his police duties and functions in an exemplary manner and he was a decorated, dedicated and loyal public servant.

34. Plaintiff was never formally charged with misconduct during his time of employment and maintained an unblemished, admirable disciplinary record.

35. On October 30, 2008, Phillips sustained a permanent injury to his hearing as a result of the incessant use of whistles by protestors at a large demonstration to which he was assigned as a police supervisor.

36. Pursuant to police protocol, Phillips filed the necessary paperwork requesting a Line of Duty injury designation by the NYPD; a finding that his hearing loss injury was related to his job duties and functions.

37. This injury rendered Phillips disabled in that he sustained hearing loss in both of his ears.

38. On June 9, 2009, Phillips received written confirmation from the Commanding Officer of the NYPD Medical Division that his line of duty injury designation request was granted.

39. This is a medical determination that his hearing loss injury occurred while he was on duty and, thus, it is job related.

40. Loss of hearing affects the major life activity of hearing.

41. Phillips, like each NYPD employee, is assigned to a specific NYPD Medical Division office for evaluation and treatment when sick or injured.

42. Each Medical Division office is located within one of the five boroughs of New York City and staffed by medical doctors referred to as district surgeons.

43. Phillips met with NYPD chief district surgeon Theobald Reich at the Medical Division Office located at One Lefrak Plaza, Jamaica, New York for auditory evaluation following the report of his on duty related hearing loss.

44. Phillips underwent auditory testing and was advised that he "failed" the hearing screening test.

45. Phillips was then referred by the NYPD medical division to the Center for Hearing Communication ("CHC") for further evaluation of his hearing.

46. Accordingly, on May 8, 2009, Phillips was evaluated by Jessica Schoen, M.A., an audiologist at CHC.

47. By letter dated May 14, 2009, and based on Phillips' CHC audiological tests, audiologist Schoen recommended to the NYPD Medical Division that Phillips receive medical clearance for hearing amplification, i.e. hearing aids.

48. On July 23, 2009, Phillips met with Dr. J. Thomas Roland, M.D., to obtain medical clearance for hearing aids after receiving the necessary referral and authorization from the Medical Division.

49. On July 30, 2011, Phillips was sent for an MRI to eliminate any neurological issues.

50. On August 25, 2009, Phillips received medical clearance from Dr. J. Thomas Roland, M.D., for hearing aids following Roland's review of the MRI report.

51. On October 9, 2009, Phillips was fitted with hearing aids at CHC, and CHC performed a hearing test which resulted in findings that Phillips could return to full duty assignment.

52. With the hearing aids, Phillips' hearing was rated as excellent.

53. Phillips is a qualified individual with a disability who met the legitimate skill, experience, education and other requirements of the Sergeant's position to which he had been assigned.

54. On January 14, 2010, Phillips appeared at the NYPD Medical Division for a follow-up evaluation and was advised he was being placed on restricted duty status, and that the Medical Division was beginning the process to submit a Police Commissioner's Application for Ordinary Disability Retirement because Phillips required hearing aids.

55. As a result, on January 14, 2010, Phillips was transferred from all full duty patrol duties and responsibilities to clerical duty assignments within the Bronx Task Force office because of his disability.

56. This was a humiliating and degrading de facto demotion for Phillips, a supervisor who was a loyal and dedicated public servant, to have it known among his colleagues and subordinates at his work location that he was on restricted duty and subject to involuntary retirement because of his disability and need to wear hearing aids.

57. From January 14, 2010 to November 30, 2010, Phillips was on restricted duty status and required to report every month to the Medical Division for a follow-up examination.

58. Restricted duty is a duty status designation imposed upon a uniformed member of the department by the NYPD Medical Division with the ratification and approval of the personnel division.

59. The restricted duty status designation is an adverse job action because it changed Phillips' duty status from full duty to a limited duty capacity, restricting the duties and functions he could perform.

60. The restricted duty status is an adverse action because Phillips lost the ability to earn overtime, despite being a qualified person with a disability.

61. The restricted duty status is an adverse action because Phillips could not seek any career advancement, despite being a qualified person with a disability.

62. The restricted duty status is an adverse action because Phillips lost the ability to compete for and obtain special assignment, despite being a qualified person with a disability.

63. Special assignment is a prestigious, career advancing promotion with additional salary, awarded in three steps.

64. The third and final step of special assignment pay is equivalent to the salary of an employee in the rank of Lieutenant.

65. On October 31, 2008, Phillips was recommended by Captain Andrew Benjamin, his commanding officer, for special assignment pay because "[h]e is a highly motivated individual and his leadership skills are exemplary."

66. The following year, in or about October or November of 2009, Phillips was again recommended by Captain Andrew Benjamin, his commanding officer, for special assignment pay based on Phillips noted positive contributions to police service.

67. Again, in or about January 12, 2010, Phillips was to be recommended by Captain Andrew Benjamin, his commanding officer, for special assignment pay because, among other attributes, "[h]e has demonstrated outstanding leadership abilities and has earned the respect of his peers and the trust of his supervisors."

68. However, Phillips was notified by e-mail communication from an administrative lieutenant officer that his request for special assignment pay was rejected because Phillips was not on full duty status and so Captain Benjamin did not endorse the special assignment recommendation..

69. Thus, because Phillips required hearing aids and was placed on restricted duty status on January 14, 2010, he lost special assignment pay and career opportunities and advancement within the police department.

70. On November 30, 2010, Phillips was present at the Medical Division for a required monthly visit because of his restricted duty status and was advised by Dr. Kornreich that the Medical Division would submit a Police Commissioner's Application for ordinary disability retirement.

71. Dr. Kornreich signed a Recommendation for Survey Form (PD 429-181) on November 30, 2010, and referred Phillips to Sergeant Foote, of the Medical Division, for processing of a Police Commissioner's Application for Ordinary Disability Retirement thereby forcing Phillips to retire from police service.

72. Phillips spoke with Sergeant Foote and advised Foote that he wanted to return to full duty status.

73. Sergeant Foote memorialized this conversation by signing his name to a note on the bottom of the Recommendation for Survey form which states "Sgt. Foote spoke with M.O.S. who disagrees with survey and seeks F/D/ status."

74. The Medical Division was fully informed by Phillips, as well as other sources, that Phillips wanted to return to full duty and was qualified to return to work with hearing aids.

75. For example, on January 25, 2010, CHC audiologist Kimberly Howry sent information to Jeffrey Kornreich, M.D., of the NYPD Medical Division stating that Phillips' prognosis for return to full duty was good with the use of hearing aids.

76. Phillips repeatedly requested to be returned to full duty status by statements to Dr. Kornreich, Sergeant Foote and the Medical Board.

77. The NYPD deliberately and intentionally ignored Phillips' requests and the independent, readily available information that Phillips is a qualified person with a disability and capable of performing the essential functions of the job to which he was assigned as a police Sergeant.

78. There is no legitimate business justification for not permitting Phillips to wear hearing aids while working.

79. Phillips was fully capable of performing the duties and functions of a patrol supervisor and, in fact, did so from October 9, 2009 (when he received his hearing aids) until January 14, 2010 (when he was placed on restricted duty status).

80. Phillips changed the batteries routinely in his hearing aids in order to ensure that they did not lose functionality during the time he was working.

81. Phillips would bring the hearing aids to his audiologist for necessary maintenance.

82. Phillips never had a hearing aid dislodge from his ear and has never had a hearing aid malfunction.

83. In addition, the hearing aid makes a warning signal in advance that Phillips can hear when the battery is low. This warning signal gives him sufficient time to change the battery before the battery is no longer functional. Phillips always carries extra batteries on his person.

84. Phillips has sufficient ability to localize sound while wearing his hearing aid.

85. Upon learning that his employer was involuntarily retiring him on ordinary disability, and despite trying to return to full duty, Phillips filed an application on February 28, 2011 for accident disability retirement to contradict the Medical Division's recommendation that his hearing loss injury was not caused by an on-the-job injury.

86. Since the NYPD was forcing Phillips to retire, Phillips was entitled to an accident disability retirement as compensation for his hearing loss which was caused by injuries he sustained while working.

87. For an employee, such as Phillips, who is qualified to work with a disability, the disability retirement process is humiliating and degrading.

88. The Police Commissioner's Application for Disability Retirement is sent by the Medical Division to the Medical Board.

89. Phillips was forced to attend an interview at the Medical Board on April 20, 2011 despite his voiced objections and his desire to return to full duty.

90. Phillips was evaluated by Medical Board members Joseph Bottner, M.D., Nicholas DePalma, M.D., and Vasilios Sierros, M.D.

91. The evaluation lasted approximately 10 minutes.

92. In sum, within 10 minutes the Defendants ended Phillips' law enforcement career.

93. The Medical Board members knew or should have know by reasonable inquiry that Phillips was not tested with his hearing aids to determine whether he was qualified to perform full duty service.

94. The Medical Board had an obligation to investigate relevant facts regarding Phillips' ability to perform his duties and functions as a police sergeant wearing a hearing aid.

95. Phillips was degraded and humiliated because he knew he could do his job, received outstanding evaluations from his superiors, yet was subjected to a process of dismissal because of a disability.

96. The Medical Board was made aware by Phillips on April 20, 2011 that he was qualified to return to work in a full duty capacity.

97. The Medical Board, led by the recommendations of Joseph Bottner, M.D., determined that Phillips should be forcibly retired from police service.

98. The members of the Medical Board, led by Joseph Bottner, M.D., knew the NYPD hearing aid policy was discriminatory against members with hearing loss, such as Phillips, based upon information previously provided to them by plaintiff Carione.

99. As a result, Phillips was forced to file for service retirement on March 7, 2011 rather than accept the reduced benefits he would receive with an ordinary disability pension.

100. On May 2, 2011, Phillips began terminal leave which is paid leave time for all vacation and leave time accrued prior to receiving pension benefits.

101. On June 30, 2011, Phillips' terminal leave ended and he was retired.

102. Phillips was forced to retire from police service and, as a result, Phillips lost his career and all benefits associated with it and was demoralized, humiliated, depressed and defeated.

103. As shown below, the NYPD standards and guidelines for hearing are not based on individualized assessments, validity testing or current medical science.

104. Phillips was terminated from police service.

105. Phillips would have remained employed with the NYPD until his 63rd birthday.

**Facts Demonstrating the Medical Board is an Agent of the NYPD and Maintains A Close Nexus or Symbiotic Relationship With The NYPD**

106. The NYPD adversely treat individuals with disabilities, such as Carione

and Phillips, by and through its relationship with the Medical Board, which is an organization tasked with assessing and investigating all applications for disability retirement forwarded to it by the Medical Division.

107.    The Medical Board is an agent of the NYPD.

108.    The Medical Board and those physicians employed by it are state actors in joint participation with the NYPD in discriminating against individuals with disabilities, such as Carione and Phillips, by ratifiying and condoning the standards and guidelines for hearing by processing members for involuntary retirement for service without permitting these members to demonstrate their qualifications wearing a hearing aid.

109.    The Medical Board is constituted by statute and compromised of more than 15 physicians [in total].

110.    Each physician appointed to the Medical Board is paid by the City of New York for their service on the Medical Board.

111.    The Medical Board assesses disability retirement applications sent to their attention by the NYPD medical division and has the power and discretion to request additional medical information, testing or any other process deemed necessary to their function of investigating facts.

112.    The Medical Board convenes regularly scheduled meetings throughout the week and at each meeting only three physicians are in attendance. Each physician, in attendance at a meeting, is designated as a representative of one of three agencies; the Commissioner of the Department of Health, or the Commissioner of Citywide Administrative Services or the Board itself. N.Y.C. Admin. Code §13-123(a).

113.    At each Medical Board session, the physicians in attendance conduct what is referred to as a "survey" i.e. a review of relevant medical information and interview of the applicant being processed by the NYPD medical division for disability retirement.

114.    The findings and recommendations of the Medical Board survey regarding a disability application are then sent to the Board of Trustees of the Police Pension Fund for ratification.

115.    The Police Pension Fund is one of five pension systems maintained by the City of New York.

116.    Based upon the recommendation of the Medical Board, the Police Pension Fund provides three types of retirement benefits to police officers: service retirement, ordinary disability (non-job-related disability) and accident disability (job-related disability).

117.    A service retirement benefit provides a pension allowance totaling one half of a member's final salary after 20 years of service, with additional benefits equal to a specified percentage per year of service in excess of the 20-year minimum.

118.    There are additional service retirement benefits by an annuity attributable to member's contributions with respect to service over the 20-year period.

119.    An ordinary disability retirement benefit generally provides a pension equal to 1/40 of a member's final salary times the number of years of service, but not less than1/2 of the final year of salary if the member has worked 10 or more years, or 1/3 of final salary if less than 10 years of service.

120.    An accident disability retirement benefit provides a pension equal to three-fourths of a member's final salary, plus other increments as described above for a service retirement, based upon years of service plus annuity contributions.

121.    In determining the retirement benefit a member is entitled to, the Police Pension Fund ratifies determinations and recommendations made by the Medical Board.

122.    The Medical Board is not a separate and independent agency from the Medical Division of the NYPD.

123.    The Medical Board is housed within the NYPD Medical Division, located at One Lefrak Plaza, Jamaica, New York.

124.    The NYPD Medical Division provides the Medical Board all of its ancillary services, support staff and physical office space.

125.    The Medical Board conducts all of the interviews of the disability applicants for retirement within the offices of the NYPD medical division.

126.    Each applicant's Medical Board file is maintained and processed within the NYPD medical division by NYPD medical division personnel.

127.    All scheduling and appointments for Medical Board appearances are conducted by NYPD medical division personnel.

128.    Any medical referrals required and mandated by the Medical Board are processed and billed through the NYPD medical division.

129.    Each Medical Board physician routinely and regularly interacts with the NYPD medical division personnel in sharing applicant information, reviews and assessments.

130.    The Medical Board is a de facto agent of the NYPD and ratifies, sanctions, and implements NYPD policies, including the standards and guidelines for hearing.

131.    For example, despite having the mandate to investigate all facts fairly and honestly, the Medical Board directs members to Marc Kramer, Ph.D for further consultation in determining whether to force a member's retirement from service.

132.    The standards and guidelines for hearing have been developed under the guidance of Marc Kramer, Ph.D., a audiologist and retained consultant by the NYPD.

133.    Marc Kramer is the NYPD's chief [and only] hearing consultant and has been given the designation of honorary police surgeon which is the equivalent to the rank of inspector within the NYPD.

134.    In addition to recommending the standards and guidelines for hearing adopted by the NYPD, Marc Kramer also maintained a private office, at all times relevant to the acts challenged in this complaint, for assessment and evaluation of police officers with hearing loss sent to him by the Medical Board.

135.    In sum, and as and for a further example of the symbiotic relationship between the Medical Division and the Medical Board, Kramer is compensated by the NYPD for consulting with the Medical Division and other managers regarding the NYPD standards and guidelines for hearing, and is compensated by the NYPD to assess police officers with hearing loss sent to him by the Medical Board.

136.    Kramer, acting at the request of the Medical Board, implements, ratifies and fulfills the decisions made by the NYPD Medical Division with respect to separating from service police officers who wear hearing aids on ordinary disability because Kramer will routinely medically determine that a police officer's hearing loss is not caused by a job-related injury, thereby forcing an officer to accept the ordinary disability retirement the Medical Division has recommended.

137.    In other words, Kramer acts on behalf of the NYPD Medical Division through his relationship with the Medical Board.

138.    Kramer does not test police officers sent to him for assessment by the Medical Board with hearing aids to the detriment of those members who are disabled and qualified to work.

139.    In addition, the Medical Board through the direction and recommendations of medical board physician Joseph Bottner, M.D., deliberately and intentionally applied the standards and guidelines for hearing, jointly with the NYPD, causing the involuntary retirement of Carione and then Phillips.

140.    Bottner and Kramer knew or should have known the standards and guidelines for hearing  was unlawful in that it discriminated against qualified individuals with disabilities without a rational basis, yet both Bottner and Kramer were deliberately indifferent to the law and ratified, condoned and implemented the policy by recommending that Carione and Phillips receive ordinary disability retirement.

141.    Bottner's actions were not independent of the NYPD but were in furtherance of the NYPD's standards and guidelines for hearing, which terminates the service of members wearing hearing aids.

142.    The actions taken by Bottner, Kramer and the Medical Board are the responsibility of the NYPD.

143.    Bottner, Kramer and the Medical Board are joint participants in the acts of the NYPD, forcing qualified officers with hearing loss from service without consideration as to whether the officer is qualified to work with a hearing aid.

144.    Bottner led the Medical Board in its decisions related to Phillips and Carione.

145.    Bottner refused to investigate facts provided by Phillips and Carione demonstrating that each was qualified to work with a disability.

146.    Bottner refused to permit Carione and/or Phillips to be tested with hearing Aids by not referring each to be tested with their hearing aids.

147.    Bottner knew or should have known that the NYPD standards and guidelines for hearing were not job-related because there is no routine follow up hearing test for all members of the service.

148.    Bottner knew or should have known that only tenured NYPD officers who suffered a trauma or injury are subject to the standards and guidelines for hearing demonstrating his individual leadership role in a process that unfairly and adversely harms qualified disabled members with hearing loss by forcing their involuntary retirement.

Facts Relevant To Carione

149.    Carione began his police service on July 3, 1989.

150.    At all times during his employment, Carione performed his duties and functions in an exemplary manner, and he was a decorated, dedicated and loyal public servant.

151.    In 2008, Carione was promoted to the rank of Deputy Inspector.

152.    As an NYPD Deputy Inspector, Carione was assigned as the Commanding Officer of Queens County, Internal Affairs Bureau, and was responsible for supervising a staff of fifty investigators and overseeing sensitive misconduct investigations within the NYPD.

153.    Carione has an impeccable and admirable disciplinary record.

154.    On July 4, 1996, Carione was involved in an on-duty incident in which 5 gun rounds were fired by his partner approximately 18 inches from his right ear.

155.    Pursuant to police protocol, Carione requested a Line of Duty injury

designation by the NYPD in 1996 for tinnitus, pain and ringing in his ears; a finding that diagnosed tinnitus was related to his job duties and functions.

156.    Subsequently, within one month of filing the Line of Duty materials, Carione received written confirmation from the Commanding Officer of the NYPD Medical Division that his line of duty injury designation request was granted.

157.    This is a medical determination that the tinnitus injury was caused by an on-duty event.

158.    Carione noticed immediate loss of hearing in 1996.

159.    Carione is disabled as a result of this hearing loss.

160.    Loss of hearing affects the major life activity of hearing.

161.    On June 24, 2008, Carione scheduled an appointment at the medical division of the NYPD to obtain authorization to have an evaluation for a hearing aid as result of the 1996 shooting and the resulting hearing loss.

162.    Carione, like each NYPD employee, is assigned to a specific NYPD medical division office for medical evaluation, each located within the five boroughs of New York City and staffed by medical doctors referred to as district surgeons.

163.    Carione was assigned to the Brooklyn medical division and district surgeon Stanley Edelman, M.D.

164.    Carione reported to Dr. Edelman on June 24, 2008 to obtain authorization for a hearing aid.

165.    Carione was then provided the necessary authorizations by Dr. Edelman to be tested for hearing loss at the League for the Hard of Hearing [now the Center for Hearing and Communication] (CHC) and fitted for a hearing aid.

166.    On July 7, 2008, Carione began the long process to obtain a hearing aid and had his hearing tested at CHC by Ralph Moscarella.

167.    From July 7, 2008 until November 11, 2008, Carione was tested and fitted by CHC for a hearing aid for his right ear.

168.    On March 18, 2009, Carione picked up his hearing aid at CHC.

169.    On April 29, 2009, Carione was directed to meet with Dr. Edelman who advised Carione that he [Edelman] was recommending the submission of a Police Commissioner's Application for Ordinary Disability Retirement, which began the process to involuntarily retire Carione from police service because he was disabled.

170.    Carione protested this decision and went to see Inspector Kevin Halloran, Commanding Officer of the Medical Division [now Director of the Police Pension Fund].

171.    Halloran confirmed that Carione would be processed by the NYPD, through the NYPD medical division, for retirement from employment because of his disability.

172.    Subsequently Carione was summoned by Michael Avelone, a disability counselor employed by the Superior Officer's Council, a collective bargaining unit for Police Department employees in the rank of lieutenant or above.

173.    Avelone advised Carione that a Police Commissioner's Application for Ordinary Disability Retirement had been filed by the NYPD.

174.    Carione was further advised that since his employer was separating him from police service because of his hearing loss disability, it was in Carione's best interest to file an application for an Accident Disability Retirement since his injury was caused by an on duty incident.

175.    Carione had no choice but to file an accident disability retirement application because the NYPD had filed an ordinary disability retirement application to separate him from service.

176.    The NYPD did not individually assess whether Carione was a qualified person with a disability prior to seeking his retirement from service.

177.    Carione asked Dr. Edelman to assess him with the hearing aids and Dr. Edelman denied this request.

178.    Carione protested the decision to be forcefully retired from police service because he is able to perform all of the duties and functions of his position as well as a person who does not use a hearing aid.

179.    Subsequently, Carione was informed by his private audiologist, Dr. Seidman, that the Cros hearing aid he received and wore was the wrong type and configuration for his hearing loss.

180.    In the fall of 2009, Carione was referred by Dr. Edelman's office to Dr. Theobold Reich, the deputy chief surgeon of the NYPD medical division, to obtain authorization to be re-evaluated for replacement of the hearing aid.

181.    While in the process of obtaining authorization for re-evaluation for a new hearing aid, Dr. Reich stated to Carione that the NYPD was violating the ADA and did not understand the law, and that the hearing aid ban policy was violating the law.

182.    Reich advised Carione to obtain the services of an attorney and take civil action against the NYPD for discrimination.

183.    Reich provided Carione the needed authorization to be re-evaluated for a proper hearing aid.

184.    Carione then returned to CHC for re-evaluation and a new hearing aid.

185.    On April 26, 2010, Carione's Cros hearing device was replaced with a fully digital, in the ear canal, phonic hearing aid.

186.    Subsequently, Carione was tested by CHC audiologists who performed a hearing test allowing Carione to wear his new hearing aid.

187.    Carione passed the hearing test and the hearing test results indicated Carione's hearing was "excellent," with greater than a 92 percent word recognition in the affected ear.

188.    Carione was a qualified individual with a disability and fully capable of performing the duties and functions of a deputy inspector.

189.    He changes the battery routinely in his hearing aid in order to ensure that it does not lose functionality during the time he is working.

190.    He also brings the hearing aid to his audiologist for regular maintenance.

191.    Carione has never had his hearing aid dislodge from his ear and has never had a hearing aid malfunction.

192.    In addition, the hearing aid makes a warning signal 45 minutes in advance that Carione can hear when the battery is low.

193.    This warning signal gives him sufficient time to change the battery before the battery is no longer functional. He always carries extra batteries on his person.

194.    The NYPD never permitted nor requested that Carione's hearing be tested with his hearing aid.

195.    In or about July 2008, Carione's duty status was changed from full duty to restricted duty by the Medical division of the NYPD because of Carione's disability, yet Carione remained fully able to function in a full duty status, and in fact continued his full duty assignment with the shooting response team rotation for the Internal Affairs Bureau.

196.    The shooting response team is available 24/7 to respond to, and investigate, any police shooting.

197.    Carione also remained assigned to the inspector duty chart which required 24/7 availability for response to the field for police misconduct investigations.

198.    Between 2008 and his retirement in 2010, Carione was called to the field dozens of times to conduct active investigations.

199.    Carione was fully qualified to perform the duties and functions of his assignment while wearing a hearing aid.

200.    Despite Carione's requests to be returned to full duty, his retirement was processed.

201.    Over his objections, Carione was approved for an accident disability pension on July 15, 2010 by the Medical Board, with a recommendation to the Police Pension Fund to approve same, despite Carione's repeated requests to be returned to full duty.

202.    Dr. Joseph Bottner was not involved in the Medical Board decision of July 15, 2010.

203.    From July 15 to August 15, 2010, Carione remained at his post as commanding officer and assisted the incoming commanding officer with the transition.

204.    Carione went on vacation from August 15 to September 8, 2010.

205.    Upon returning from vacation, Carione was informed that the decision to

award him an accident disability retirement was remanded by the Pension Fund back to the Medical Board for a follow-up assessment.

206.    On September 8, 2010, Carione was then involuntarily transferred to the Office of the Chief of Internal Affairs Bureau at One Police Plaza, and relieved of his well deserved assignment as the commanding officer of the Queens Internal Affairs Bureau.

207.    Carione was assigned no duties and responsibilities within the Chief's office and was excluded from meetings, the daily operations of the office, and was given menial tasks, and no staff.

208.    Carione was given a work station just outside the Chief's office while a subordinate sergeant maintained a full, personal, office space.

209.    Carione was not given any significant duties and responsibilities because of his disability.

210.    Carione was not afforded the opportunity by his employer to demonstrate that he was qualified to perform the functions of a deputy inspector, prior to having his duty status adversely changed to a restricted duty designation.

211.    Carione was adversely treated because he became ineligible for promotions or advancement because of the hearing loss disability.

212.    In or about late November of 2010, Carione was advised by Charles Campisi, Chief of Internal Affairs Bureau, that the entire executive staff of the Internal Affairs Bureau had met and voted that Carione would be the first choice for promotion to full Inspector.

213.    Chief Campisi advised Carione that he could not submit his name to be promoted because Carione was on restricted duty, and if he [Carione] could get restored to full duty, Chief Campisi would get Carione promoted.

214.    Carione was eligible and would have been promoted to the rank of full inspector, but for his disability.

215.    Carione was eligible and would have advanced his career even beyond the rank of inspector within the NYPD, but for his disability.

216.    Carione repeatedly requested to be placed back to full duty because of the excellent hearing benefit afforded to him by his hearing aid.

217.    Carione conveyed his request to Dr. Edelman, Dr. Reich and members of Medical Board, namely Dr. Joseph Bottner, Dr. Nicholas DePalma, Dr. Marjorie Shreiber, Dr. Stephen Borkow, and NYPD independent consultant Marc B. Kramer, Ph.D.

218.    Carione also conveyed his request to be accommodated with a hearing aid and returned to work, in writing, to the NYPD's internal Office of Equal Employment Opportunity ("EEO") on October 21, 2010.

219.    Deputy Chief Thomas Mason, of the Internal Affairs Bureau, wrote a response to Carione's internal EEOC complaint addressed to Commissioner Neldra M. Zeigler, in which he stated that Carione was fully qualified to perform his duties and responsibilities as a Deputy Inspector wearing a hearing aid.

220.    Carione advised Dr. Kleinman, the Chief Surgeon of the Medical Division, that the hearing standard policy was flawed.

221.    The NYPD did not permit and, in fact, refused to permit Carione to demonstrate his ability to perform the essential functions of his job as a disabled person.

222.    Despite being a qualified individual with a disability and otherwise fully capable of performing his job duties and responsibilities, Carione has been deprived of the same employment opportunities as a person who does not use a hearing aid, e.g., he has been removed

from his commanding officer assignment, denied promotional opportunities, and was subjected to an involuntarily retirement based upon his disability.

223.    The NYPD, its agents and employees, ignored the readily available testing information from the CHC identifying Carione's excellent hearing abilities, and the fact that Carione is a qualified person with a disability who is capable of performing the essential functions of the job to which he was assigned, as a Police Officer in the rank of Deputy Inspector.

224.    On November 8, 2010, Carione was advised by the NYPD internal EEO office without any interactive process that his request for an accommodation had been denied.

225.    Carione was caused to appear, by the NYPD's filing of a Police Commissioner's Ordinary Disability Application, before the Medical Board on July 15, 2009, November 11, 2009, May 19, 2010, July 14, 2010, October 6, 2010, and March 2011.

226.    Carione advised the Medical Board through Joseph Bottner at each appearance that he was capable of working and wished to return to full duty.

227.    The Medical Board and Joseph Bottner deliberately and intentionally ignored Carione's requests and medical information because each is a joint participant in the enforcement of the standards and guidelines for hearing resulting in termination of the plaintiff's employment.

228.    The Medical Board and Joseph Bottner deliberately and intentionally ignored the information that Carione was a qualified person with a disability because of its and Bottner's close relationship with the NYPD, and its and his subjugation to the NYPD's authority.

229.    In October of 2010, Bottner and the Medical Board advised Carione that they were recommending to the Board of Trustees of the Police Pension Fund that the Police Commissioner's application for ordinary disability retirement be granted, and Carione's application for accident disability benefits be denied.

230.    This involuntarily forced Carione to submit a request for a service retirement to protect the benefits and privileges to which he was entitled.

231.    In or about January of 2011, Carione gave his mandatory 30 days notice of terminal leave in advance of a service retirement.

232.    In February of 2011, Carione began his terminal leave.

233.    In March of 2011, Carione learned that the October 2010 recommendations of the Medical Board had been approved by the Board of Trustees of the Police Pension Fund.

234.    Carione had been involuntarily retired with ordinary disability benefits, but opted to take his full service retirement instead.

235.    On June 26, 2011, Carione's terminal leave ended and his service retirement commenced.

236.    Carione lost future pay and benefits, including an increased pension benefit, because he was forced to retire at the age of 44.

237.    Carione would have remained employed with the NYPD until his 63rd birthday.

238.    Carione was terminated from police service.

239.    But for the participation of the Medical Board, Kramer and Bottner in the unlawful policy of the NYPD, Carione would not have been forced to retire from service.

**The Deficient and Unlawful NYPD Standards and Guidelines for Hearing**

240.    On January 19, 2011, the Medical Board issued a memorandum to the Board of Trustees Police Pension Fund in response to a request for information made by the Executive Officer of the Pension Fund regarding Carione.

241.    The January 19, 2011, memorandum specifically referred to Carione.

242.    The January 19, 2011, memorandum referenced the NYPD's hearing aid policy as contained in a September 24, 2009 memorandum.

243.    As referenced in the January 19, 2011, memorandum, the September 24, 2009, memorandum was issued by the Office of the Supervising Chief Surgeon to the Chief of Personnel involving the department Hearing Standards.

244.    As referenced in the January 19, 2011, memorandum, the September 24, 2009, memorandum states: "The standards and guidelines for hearing adopted by the NYPD for prospective police officer candidates and members of the service currently functioning at full duty derives from the extant literature, and empirical observations regarding the essential duties of police officers, which have been validated and generally accepted nationally."

245.    As referenced in the January 19, 2011, memorandum, the September 24, 2009, memorandum notes specifically, "At present Hearing Aid devices to enhance hearing functions may not be worn by full duty police officers and do not restore lost hearing."

246.    As referenced in the January 19, 2011, memorandum, the September 24, 2009, memorandum further states: "While in theory a situation may arise where a hearing aid device could be recommended to mask Tinnitus (ringing in the ears), tinnitus of such severity will often affect other hearings functions to a level inconsistent with the performance of full duty."

247.     The January 19, 2011, memorandum also references the policy in an earlier writing, dated January 12, 2010, from Rafael Pineiro, Chief of Personnel.

248.     As referenced in the January 19, 2011, memorandum, paragraph 2 of the January 12, 2010, policy states, "The Department's established policy is that uniformed members of the service may not perform full duty while using a hearing aid for hearing loss. A police officer's job requirement necessitates normal hearing capabilities without the use of a hearing aid."

249.     As referenced in the January 19, 2011, memorandum, there is a first endorsement on the January 12, 2010, policy, dated February 8, 2010, signed by Raymond Kelly the Police Commissioner and Raymond Spinella, Deputy Chief, which states as follows: "Executive Officer, Police Commissioner's Office to Chief of Personnel, February 8, 2010. Contents noted. Recommend Approval of the First Deputy Commissioner's recommendation that there is NO change in the Department's hearing aid policy. Forward for your necessary attention."

250.     The referenced policy (standards and guidelines for hearing) as stated in the January 12, 2010, memo was formulated by a committee tasked by the Police Commissioner to address Carione's requests to return to full duty assignment.

251.     This committee was tasked by the Police Commissioner, in relevant part, with examining whether employees with hearing aids were qualified for full duty police assignment.

252.     Members of the committee included the NYPD Chief of Personnel, members of the NYPD legal bureau, the Commanding officer of the Medical Division, NYPD

Chief Supervising Surgeon Kleinman of the Medical Division, and Dr. Marc Kramer, a consultant with a Ph.D. in audiology.

253.    This committee did not make individualized assessments of Carione or Phillips, or other hearing disabled employees as to whether each identified individual was able to perform the essential functions of their jobs.

254.    This committee did not make its findings based upon job-related hearing standards.

255.    This committee did not make its findings based upon current medical knowledge, and/or the best available objective and validated information, about whether hearing aids restore hearing to sufficient levels so that Carione and Phillips are qualified to perform their jobs.

256.    Absent the required individualized assessment considerations, this committee ratified and endorsed the pre-existing September 24, 2009, standards and guidelines that uniform members of the service may not perform full duty while using a hearing aid for hearing loss.

257.    The standards and guidelines also state that a police officer's job requirement necessitates normal hearing capabilities without the use of a hearing aid.

258.    The standards and guidelines for hearing adopted by the NYPD for prospective police officer candidates, and members of the service currently functioning at full duty, is not job-related because it "derives from the extant literature, and empirical observations regarding the essential duties of police officers, which have been validated and generally accepted nationally."

259.    In other words, these standards are not based upon individualized

assessments and validation testing of New York City Police Officers, including Carione and Phillips, resulting in the adverse treatment of applicants and tenured police officers.

260.    In fact, many law enforcement agencies permit the use of hearing aids, including the federal marshal's service and the New York State police.

261.    The standards and guidelines for hearing adopted by the NYPD do not demonstrate a finding that an employee with a hearing aid posed a direct threat, or significant risk of substantial harm, to him or herself, or public safety.

262.    Carione has repeatedly requested a copy of the January 12, 2010, policy detailing the justification for standards and guidelines for hearing , but has yet to receive a copy, despite the fact the Medical Board relied upon it in making its determinations regarding Carione's employment.

263.    In enacting its standards and guidelines for hearing, the NYPD failed to conduct the necessary and appropriate validity testing of its members to assess whether such a policy was job-related.

264.    Police officers are not routinely tested for hearing loss so there is no relevant data or information, which would objectively inform and validate the standards and guidelines presently in use.

265.    Police officers wearing hearing aids are not tested with their hearing aids so there is no relevant data or information, which would objectively inform and validate the standards and guidelines that prevent the use of a hearing aid.

266.    The standards and guidelines for hearing require tenured police officers, such as Carione and Phillips, to be terminated, absent an individualized assessment as to whether the officer is capable of performing his or her job duties and functions with a hearing aid.

267.    The standards and guidelines for hearing prevent job applicants and tenured employees from obtaining employment and maintaining employment, despite being qualified for employment with a hearing aid.

268.    The standards and guidelines for hearing are a custom, practice or usage of the NYPD which discriminates against qualified disabled individuals in hiring, promotion and job retention for no legitimate purpose.

269.    The standards and guidelines for hearing are currently relied upon by the NYPD Medical Division and the Medical Board in assessing whether officers with hearing disability, such as Carione and Phillips, can be hired and/or retained for employment.

270.    Joseph Bottner, M.D., acted as an agent of the NYPD and is a state actor.

271.    Joseph Bottner, M.D., disregarded information provided to him by Carione, which demonstrated that the NYPD policy was unlawful and discriminatory against disabled persons with hearing loss.

272.    Carione advised Bottner and the Medical Board of the CHC's findings.

273.    Despite having the authority and responsibility to properly evaluate and assess underlying medical issues, conditions and disabilities in determining whether a police officer should be forced to retire from service, Bottner intentionally and deliberately failed to consider hearing tests conducted with Carione and Phillips wearing a hearing aid, thereby deliberately and intentionally ratifying the standards and guidelines for hearing, and recommending Carione and Phillips receive ordinary disability retirement from service.

274.    An ordinary disability retirement is an adverse job action because it causes termination from service.

275.    Bottner knew or should have known that both Carione and Phillips were

qualified to return to work.

**The NYPD Has Failed to Provide Reasonable Accommodation**

276.    The NYPD knew that Carione and Phillips are individuals with a disability requiring an accommodation.

277.    The first step in providing a reasonable accommodation is to engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested.

278.    The interactive process continues until, if possible, an accommodation reasonable to the employee and employer is reached without undue hardship.

279.    The NYPD did not engage in an interactive process designed to permit employees, such as Carione and Phillips, to perform the essential functions of their jobs with hearing aids.

280.    The NYPD did not engage in any process designed to determine which essential work functions Carione and Philips could or could not perform before separating each of them from service.

281.    The NYPD was aware that Carione and Philips each required a hearing aid through Carione's communications with the Office of Equal Employment Opportunity, the CHC, the medical division, the Chief of Personnel, the Commanding Officer of the Medical Division, District Surgeon Edelman, Dr. Reich, Marc Kramer, Ph.D., Joseph Bottner, M.D., Dr. Kleinman, and other members of the NYC Medical Board of the Police Pension Fund.

**Final Policy Makers**

282.    Raymond Kelly is the New York City Police Commissioner and the final policymaker for that agency.

283.     Kelly is also the de facto final policy maker for the NYPD Article II Medical Board.

284.     As the final policy maker, Kelly specifically endorsed, ratified, and adopted the standards and guidelines for hearing, which resulted in the adverse acts against plaintiffs stated in this complaint.

**Employer Liability for the Acts of Its Agents**

285.     The City of New York is liable for the actions of its agents and employees including the Medical Board, Kelly, Kramer, and Bottner under the theory of respondeat superior and/or vicarious liability.

**The Unfair and Disparate Standards and Guidelines for Hearing**

286.     The standards and guidelines used by the defendants, City of New York, Medical Board, Raymond Kelly, and Joseph Bottner were stated in a September 24, 2009, memorandum and later confirmed in a January 12, 2010, memorandum.

287.     As described in the September 24, 2009, memorandum addressed to the Chief of Personnel by the Office of the Supervising Surgeon, the hearing standards and guidelines are only used pre-employment or following an injury, trauma, or whenever an ear or hearing problem comes to the attention of the Medical Division by way of clinic visits for medical complaints.

288.     As described in the September 24, 2009, memorandum addressed to the Chief of Personnel by the Office of the Supervising Surgeon, there is no routine follow-up hearing tests for members of the service who may have developed a hearing impairment during the course of their careers, or due to the aging process.

289.     As described in a September 24, 2009 memorandum addressed to the

Chief of Personnel by the Office of the Supervising Surgeon, a de facto "Don't Ask, Don't Tell" policy exists.

290.     As described in a September 24, 2009 memorandum addressed to the Chief of Personnel by the Office of the Supervising Surgeon, hearing aid devices to enhance hearing function may not be worn by full duty officers, thus, there is no hearing testing permitted of members of the service who have been cleared to return to work with a hearing aid, resulting in their involuntary loss of employment.

291.     The standards and guidelines for hearing result in the disparate treatment of disabled tenured officers who are qualified to perform the job duties and functions of a police officer because they are subject to standards and guidelines for hearing not imposed upon all members of the service.

292.     After employment, there is no routine follow-up hearing tests for members of the service who may have developed a hearing impairment during the course of their careers, or due to the aging process.

293.     Only disabled officers who request hearing aids to assist their hearing loss are subject to the standards and guidelines for hearing.

294.     It is not rational as a matter of public policy and practice that the NYPD utilizes standards and guidelines for hearing only at the pre-employment stage or following an injury, trauma or whenever an ear or hearing problem comes to the attention of the Medical Division by way of clinic visits for medical complaints.

295.     The "Don't Ask, Don't Tell" standards and guidelines are not rational as a matter of public policy and practice because they  single out disabled police officers who wear hearing aids and treat them unequally and unfairly by requiring them to have follow-up hearing

examinations without a required hearing aid resulting in loss of employment, while there is no routine follow-up hearing tests for all members of the service who may have developed a hearing impairment during the course of their careers and do not request medical clearance for a hearing aid, or due to the aging process have suffered hearing loss and do not request medical clearance for a hearing aid.

296.    It is not rational as a matter of public safety, and not objectively reasonable, that the defendants do not require a routine follow-up hearing test for all tenured police officers.

297.    It is not rational as a matter of public safety, and not objectively reasonable, that there are no enforced standards and guidelines for hearing for all officers but only for those who are disabled, yet qualified to work.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE AMERICANS WITH DISABILITIES AMENDMENTS ACT, 42 U.S.C. §12101, *ET SEQ.*
## (CITY OF NEW YORK AND MEDICAL BOARD)

298.    The plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

299.    The defendant employer has violated each plaintiff's rights under the Americans with Disabilities Amendments Act, 42 U.S.C. § 12101, *et seq.*

300.    Plaintiffs have suffered injuries and damages, including loss of employment; loss of career advancement opportunities; loss of salary; reduction in pension benefits; extreme stress; humiliation; embarrassment; mental anguish; and damage to their reputations.

301.    Plaintiffs request compensatory and equitable damages, attorneys' fees

and costs in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW, ADMINISTRATIVE CODE §8-107, *ET SEQ.*, BASED UPON DISABILITY
### (CITY OF NEW YORK)

302.     The plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

303.     Defendant City of New York has violated each plaintiff's rights under the New York City Human Rights Law §8-107, *et seq.*

304.     Plaintiffs have suffered injuries and damages, including loss of employment; loss of career advancement opportunities; loss of salary; reduction in pension benefits; extreme stress; humiliation; embarrassment; mental anguish; and damage to their reputations.

305.     Plaintiffs request compensatory and equitable damages, attorneys' fees and costs in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. §1983 AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (CITY OF NEW YORK AND MEDICAL BOARD)

306.     The plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

307.     Defendants City of New York and the Medical Board have violated each plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. §1983.

308.     Defendant City of New York is a state actor and ratified and adopted the

standards and guidelines for hearing – a policy, practice or custom - which treats disabled and qualified police officers unfairly and unequally [ as detailed above] from other tenured officers who are not subject to routine follow up testing for hearing loss.

309.    Defendant Medical Board is a state actor because it is a municipal entity and maintains a close nexus and relationship with the City of New York and New York City Police Department.

310.    Defendant Medical Board ratified and adopted the standards and guidelines for hearing – a policy, practice or custom – which treats disabled and qualified police officers unfairly and unequally [as detailed above] from other tenured officers who are not subject to routine follow up testing for hearing loss.

311.    The policy, practice and custom of the defendants is not a rational policy as a matter of public interest and safety because not all tenured officers are subject to follow up routine testing for hearing [as further detailed above].

312.    Plaintiffs have suffered injuries and damages, including the loss of employment, the loss of career opportunities, the loss of pension benefits, anger, frustration, humiliation and embarrassment.

313.    Plaintiffs request compensatory and equitable damages, attorneys' fees and costs in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF 42 U.S.C. §1983 AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (INDIVIDUAL DEFENDANT BOTTNER)**

314.    The plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

315.    Medical Board Member Joseph Bottner, M.D., is a state actor by virtue of

his employment by the NYPD Article II Medical Board and payment of his salary by the New York City Police Department, in conjunction with his close relationship and nexus with the New York City Police Department Medical Division.

316.    Joseph Bottner was personally and individually involved in acts stated in this complaint whereby he ratified and condoned the standards and guidelines for hearing and personally, and individually lead and influenced the Medical Board panel which recommended the involuntary retirement of Carione and Phillips from police service.

317.    Joseph Bottner controlled the Medical Board and the decisions it made with respect to Carione and Phillips.

318.    Plaintiffs have suffered injuries and damages, including the loss of employment, the loss of career opportunities, the loss of pension benefits, anger, frustration, humiliation and embarrassment.

319.    Plaintiffs request compensatory and equitable damages, attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE,** plaintiffs demand the following relief jointly and severally against all o f the defendants:

a.  Compensatory and equitable damages in an amount to be determined at the time of trial, including back pay, front pay, and pension benefits;

b.  The convening and empanelling of a jury to consider the merits of the claims;

c.  Attorneys' fees and costs;

d.  Injunctive and declaratory relief against all defendants;

e.  Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
        September 22, 2011

Respectfully Submitted,

Meenan & Associates, LLC
*Attorneys for Plaintiff*
64 Fulton Street, Suite 502
New York, New York 10038
(212) 226-7334

By: _____
       Colleen M. Meenan (CM7439)


The Law Office of Joseph H. Harris, PLLC
*Attorney for Plaintiff*
800 West End Avenue
New York, New York 10025
By: Joseph H. Harris